**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **CHRISTOPHER MANN,** *Individually and on behalf of all others similarly situated* ) ) ) ) | **CASE NO. 1:07-cv-3512** |
| **Plaintiffs,** ) ) | **Judge Dan Aaron Polster** |
| vs. ) ) ) | **MEMORANDUM OF OPINION AND ORDER** |
| **CSX TRANSPORTATION, INC.,** ) ) | |
| **Defendant.** ) | |

Before the Court are Defendant CSX Transportation, Inc.'s Motion for Summary Judgment **(ECF No. 83)**, Plaintiffs' Motion for Sanctions for Spoliation of Evidence (**ECF No. 85**), Defendant's Motion to Strike Expert Report and Exclude Expert Testimony of Harvey Rosen (**ECF No. 93**) and Defendant's Motion to Strike Expert Affidavit and Limit Expert Testimony of Timothy Buckley (**ECF No. 103**).  For the reasons stated *infra*, Defendant's Motion for Summary Judgement is **GRANTED**, Plaintiffs' Motion for Sactions is **DENIED**, and Defendant's Motions to Strike are **DENIED AS MOOT**.

## I. BACKGROUND

On October 10, 2007 at approximately 12:00 p.m., a CSX Transportation ("CSXT" or "Defendant") train headed for Buffalo, New York derailed near Painesville, Ohio.

(ECF No. 95 at 6.) Thirty one cars, nine of which contained hazardous materials, derailed during the incident. (*Id.*) The derailment caused a fire that burned for around sixty hours. (*Id.*) Two thousand eight hundred tons of material burned in the fire, including ethanol, plywood, polyethylene, creosote treated railroad ties, corn starch, biodiesel, feed, glycerin and phthallic anhydride. (*Id.* at 7.) The smoke from the fire traveled east and northeast only occasionally straying slightly south. (ECF No. 83-4 at 14-18.) Ohio emergency personnel oversaw an evacuation of a one half mile radius. (ECF No. 83-1 at 6.) The evacuation was lifted and residents returned within three days. (ECF No. 85-1 at 13.)

The next day, Plaintiffs filed a putative class action complaint in the Lake County Court of Common Pleas for damages caused by exposure to the toxic substances released by the derailment. (ECF No. 1-1.) The case was removed to the Northern District of Ohio on November 11, 2007. (ECF No. 1.) Following two amendments, Plaintiffs' complaint, under theories of strict liability, negligence and medical monitoring, primarily sought the establishment of a judicially-administered medical monitoring program, punitive damages and attorney's fees. (ECF No. 32.)

On August 11, 2008, Defendant moved to dismiss Plaintiffs' complaint. (ECF No. 39.) The Court granted Defendant's Motion to Dismiss the strict liability and medical monitoring claims, leaving only Plaintiffs' negligence claim. (ECF No. 61.) Pursuant to their case management plan and subsequent amendments, the parties commenced and completed discovery. On July 31, 2009, after discovery had been completed, Defendant filed the instant

Motion for Summary Judgment.[1] (ECF No. 83.)

Defendant asserts that Plaintiffs' experts have provided no testimony on causation and therefore Plaintiffs do not have any evidence to prove their case. (ECF No. 83-1 at 41.) Furthermore, Defendant argues that Plaintiffs have not demonstrated that exposure to substances released in the derailment have caused damages in the form of significantly increased risk of disease. (*Id.* at 30.) Critically, Defendant notes, Plaintiffs have not undergone any medical testing for dioxins and have done almost no testing of their homes for elevated levels of dioxins. (ECF No. 83-1 at 43-44.)

Plaintiffs respond that the fire resulted in the release of dioxins and other chemicals, which exposed, and continue to expose, a class of people in the Painsville area to an increased risk of cancer and other diseases. (ECF No. 95 at 7.) They argue that their experts, through air dispersion modeling and dioxin maps, have determined that there are levels of dioxins above background in the impact areas and that the dioxins were from the fire. (*Id.* at 15.) Finally, Plaintiffs state that the class-wide medical surveillance program is necessary for the early detection of the effects of an exposure, at a point where intervention can prevent disease or disability. (*Id.* at 9.)

## II. MOTION FOR SUMMARY JUDGMENT

### A. Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be

---

[1] As discussed, *supra*, after Defendant moved for summary judgment, Plaintiff filed its Motion for Spoliation of Evidence (ECF No. 85). Defendants subsequently filed Motions to Strike Expert Report and Exclude Expert Testimony of Harvey Rosen (ECF No. 93) and to Strike Expert Report and Limit Expert Testimony of Timothy Buckley (ECF No. 103). All of these motions are adjudicated in this memorandum of opinion and order.

granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). To prevail, the moving party must demonstrate the absence of a genuine issue of material fact as to an essential element of the opposing party's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001). Once the movant has satisfied its burden, the nonmoving party must produce evidence showing that a genuine issue of material fact remains. *Plant v. Morton Intl'l Inc.*, 212 F.3d 929, 934 (6th Cir. 2000).

In determining whether the moving party has met its burden, the court must view the factual evidence and draw all reasonable inferences in the light most favorable to the nonmoving party. *See Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). The courts' function "is not to weigh the evidence and determine the truth of the matters asserted, 'but to determine whether there is a genuine issue for trial.'" *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

Summary judgment is proper when the nonmoving party has had adequate time for discovery and yet "'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Harris v. Bornhorst*, 513 F.3d 503, 509 (6th Cir. 2008) (quoting *Celotex*, 477 U.S. at 322). If the nonmoving party fails to make a sufficient showing on an essential element of the case for which it bears the burden of proof, the moving party is entitled to summary judgment as a matter of

law.  *See Williams v. Ford Motor Co.*, 187 F.3d 533, 537-38 (6th Cir. 1999).  To avoid summary judgment, the nonmoving party "must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial."  *Chao v. Hall Holding Co.*, 285 F.3d 415, 424 (6th Cir. 2002).  It is well-settled that "[t]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]."  *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 566 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 252).

**B.      Negligence**

Ohio law recognizes medical monitoring as a form of damages for an underlying tort.  *See Wilson v. Brush Wellman*, 817 N.E.2d 59, 63 (Ohio 2004).  Therefore, medical monitoring is only granted if a plaintiff is able to prove all the elements of the underlying tort.  In order to avoid summary judgment, Plaintiffs must make a showing of a genuine issue of material fact as to the elements of a negligence claim under Ohio law: (1) Defendant had a duty to Plaintiffs, (2) Defendant breached that duty, and (3) Plaintiffs suffered damages directly and proximately caused by Defendant's breach.  *See, e.g., Menifee v. Ohio Welding Products*, 15 Ohio St. 3d 75, 77 (Ohio 1984).

In a submission to the Court dated September 23, 2008, Defendant admitted to the first two elements of Plaintiffs' negligence claim.[2]  (ECF No. 50 at 1.)  Thus, Plaintiffs must only show that Defendant's breach directly and proximately caused Plaintiffs' damages.  To

---

[2]CSXT admitted that they were "required to install rail joint bars of appropriate dimensions for the rail in order for a rail joint to be structurally sound."  (ECF No. 50 at 1.)  Further, "a joint bar of the wrong dimension was installed on the rail joint near milepost QD 155.62 prior to the derailment and that the October 10, 2007 derailment near Painesville, Ohio was factually caused by a rail failure in the east end of the joint.  Accordingly, CSXT will not contest the duty and breach elements of Plaintiffs' negligence claims."  *Id*.

-5-

meet this element of their negligence claim Plaintiffs must demonstrate a genuine issue of material fact that: (1) the dioxins released into the air by the fire are known causes of human disease; and (2) that the named Plaintiffs were exposed to the dioxins in an amount sufficient to cause a significantly increased risk of disease such that a reasonable physician would order medical monitoring.

### 1. Dioxins and Disease

Plaintiffs cannot get past the summary judgment stage because their experts rely on carcinogen classifications as their only evidence that dioxins cause the endpoint diseases[3] for which they seek medical monitoring. *See, e.g.*, *Adams v. Cooper Indus., Inc.*, Civil Action No. 03-476-JBC, 2007 WL 1075647, *3 (E.D. Ky. Apr. 4, 2007). Plaintiffs' experts have not provided an independent assessment of the causal link between dioxins and disease.

Plaintiffs' medical expert, Dr. James Kornberg, has opined that numerous organizations have classified dioxins as a known human carcinogen. (ECF No. 95-3 at 55.) However, it is not appropriate for one set of experts to bring the conclusions of another set of experts into the courtroom and then testify merely that they "agree" with that conclusion. *See Thorndike v. DaimlerChrysler Corp.*, 266 F. Supp. 2d 172, 185 (D. Me. 2003) (court excluded expert who was "parroting" other experts' conclusions); *Dupona v. Benny*, 291 A.2d 404, 408 (Vt. 1972) (testimony of expert who "was in effect not giving an opinion, but merely acting as a conduit" to express the opinions of others should have been excluded); *Missouri Highway & Transport Commission v. Modern Tractor & Supply Co.,* 839 S.W.2d 642, 655 (Mo. Ct. App.

---

[3] Plaintiffs also seek medical monitoring for chloracne, porphria cutanea tarda and Type II diabetes in addition to several cancers. (ECF No. 95-3 at 91.) Plaintiffs have provided no evidence that dioxins are causally linked to these other diseases and therefore medical monitoring is not warranted.

1992) (excluding conduit expert opinion because expert summarized other opinion without applying own expertise). Moreover, Plaintiffs' experts admit that they have not relied on any analysis of the dioxin literature in making their determinations that it is a known human carcinogen, (ECF No. 83-7 at 17.), instead merely citing to EPA, IARC and NTP documents labeling dioxins as known carcinogens. (ECF No. 104-2 at 5.)

Additionally, Plaintiffs' reliance on the VA Agent Orange Program as evidence that dioxins are "presumptively linked" to cancer is groundless. "VA/IOM classifications are not in themselves sufficient evidence from which a jury could conclude that exposure to the defendants' chemicals caused the bellwether Plaintiffs' diseases." *Adams*, 2007 WL 1075647, at *3. The VA Program was specifically designed to measure association between dioxins and endpoint diseases, not causation. Pub. L. No. 102-4, 105 Stat 11, 13 (1991). Courts have consistently held that association does not satisfy the element of causation. *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 253 (6th Cir. 2001) ("This kind of cohort epidemiological study hopes to establish an association between exposure and disease, but an association does not mean there is a cause and effect relationship."); *Henricksen v. ConocoPhillips Co.*, 605 F. Supp. 2d 1142, 1175 (E.D. Wash. 2009); *Nehmer v. United States Veterans' Admin.*, 712 F. Supp. 1404, 1416 (N.D. Cal. 1989). Accordingly, Plaintiffs have not demonstrated a causal link between dioxins and cancer.

### 2. Plaintiffs' Exposure to Dioxins and the Need for Medical Monitoring

Even if Plaintiffs could demonstrate a causal relationship between dioxins and cancer, Plaintiffs have failed to establish that they were exposed to dioxins in an amount warranting a reasonable physician to order medical monitoring. *See Day v. NLO*, 851 F.Supp.

869, 881 (S.D. Ohio 1994). To represent a putative class, named Plaintiffs must have tenable claims. Plaintiffs' theory is that they are at an increased risk of disease because they lived for eighteen months with contamination inside and around their homes. (ECF No. 95 at 41.) However, none of the named Plaintiffs present evidence that a physician has examined them or their medical records and opined that they are at an increased risk of disease.

Similarly, Plaintiffs' experts have not conducted any measurement of dioxin inside or outside of the homes of five of the seven named Plaintiffs.[4] Furthermore, three of the seven have not even lived in their air dispersion modeling expert, Dr. Erno Sajo's impact zone[5] for the eighteen months required to qualify for Dr. Kornberg's proposed medical monitoring program. Plaintiffs argue that they have shown that four of the named Plaintiffs have met the requirements by living in the impact zone for eighteen months.[6] Mere residence in the impact zone is insufficient evidence of contamination and increased risk because it ignores any individual variables, most notably, at what level the named Plaintiffs were actually exposed to dioxins. The Sixth Circuit has stated "generalized proofs will not suffice to prove individual damages." *Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1200 (6th Cir. 1988). Therefore,

---

[4] Though elevated dioxin levels were measured in the home of Dawn and Brian Ryan, no expert opinion was rendered as to whether the elevated dioxin level was due to the CSXT derailment rather than from other household causes, such as the Ryans' smoking. See Kaltofen Dep. at 189:10-192:21 (Ex. 5); B. Ryan Dep. at 36:2-5 (Ex. 23); D.Ryan Dep. at 83:3-9 (Ex. 24). Moreover, their claim still fails because they have not proven a causal link between dioxins and disease or that any increase in disease risk warrants medical monitoring.

[5] Dr. Sajo's impact zone is the area estimated to be exposed to significant amounts of dioxin based on video footage, meteorological measurements, data regarding materials consumed and produced, measurements of emissions taken by Defendant, and samples taken by Mr. Kaltofen.

[6] Plaintiffs do not contest that Christopher Mann, Jennifer Meyers and Holly Foecking did not reside in Dr. Sajo's impact zone for eighteen months.

without evidence that the named Plaintiffs have been exposed to dioxins at levels which put them at an increased risk, Plaintiffs have not presented a genuine issue of material fact.

Moreover, even if Plaintiffs presented sufficient evidence of the amount of Plaintiffs' dioxin exposure, Plaintiffs have not demonstrated that a reasonable physician would order medical monitoring based on this exposure. Plaintiffs attempt to rely upon the EPA soil cleanup level as a basis for justifying medical monitoring. (ECF No. 95 at 17-18.) There are two fatal defects in using this EPA soil cleanup level. First, demonstrating why regulatory guidelines are often not useful in the tort litigation context, *see Rowe v. E.I. DuPont de Nemours & Co.*, Civil Nos. 06-1810(RMB), 06-3080(RMB), 2008 WL 5412912 (D.N.J. Dec. 23, 2008); *Redland Soccer Club, Inc. v. Dep't of the Army*, 55 F.3d 827 (3d Cir. 1995), the EPA soil cleanup level represents a threshold for the cleanup of contaminated soil, not a danger point above which individuals require medical monitoring. While Plaintiffs argue that other courts have allowed the use of government regulations as the only basis for medical monitoring, the two cases they cite do not support this claim and come from jurisdictions with separate medical monitoring causes of action. In fact, the *Redland* court questions the EPA's determination of a significant risk and recommends that instead of using government regulations, courts should use the "standard tort risk-utility analysis." *Redland*, 55 F.3d at 840. Furthermore, even if government regulations are relevant to showing increased risk, a conservative soil cleanup level should not be used in place of a medically-based risk assessment or evidence of the actual dose level at which dioxin truly causes cancer – the danger point critical to a medical monitoring determination.

Second, the EPA's threshold soil cleanup level represents an increase in the risk

-9-

of developing cancer from the baseline level for the general population of 25% to 25.0001%.

Thus, even assuming there were a million members in this class[7] who had been exposed to this level of dioxin over their entire lives, and assuming causation, presumably only one of them would develop cancer because of the exposure.  Plaintiffs seek to commence medical monitoring based on this one in a million risk.  While Plaintiffs, without citing any authority, contend that whether the risk is significant is a question for the jury, courts have found risks higher than in the instant matter to be insignificant as a matter of law.  *Rowe*, 2008 WL 5412912; *see also O'Neal v. Dep't of the Army*, 852 F. Supp. 327 (M.D. Pa. 1994) (summary judgment in favor of defendant upon finding that plaintiffs failed to establish significant increased risk of cancer where the "contamination increased Plaintiffs' chances of contracting cancer from 25 percent to 25.03 percent.").

       Plaintiffs argue that because Dr. Kornberg testified that the increased risk of disease was significant, summary judgment cannot be granted.  Dr. Kornberg stated that because the EPA says that the risk-level is significant for soil cleanup, it was also significant for a medical monitoring program.  Dr. Kornberg does not independently demonstrate that the risk level is significant for medical monitoring.  Without more, this testimony is a legal conclusion that Plaintiffs cannot rely on to avoid summary judgment.  *See Sheridan v. NGK Metals Corp.*, 614 F. Supp. 2d 536 (E.D. Pa. 2008) (Summary judgment granted for defendant despite the fact that plaintiff's expert claimed the risk was significant.).  "'We are not willing to allow the reliance on a bare ultimate expert conclusion to become a free pass to trial every time that a

---

[7]The population of Painesville is approximately 17,000 people, not all of whom would qualify for the putative class.  *See* www.painesville.com (reporting the 2000 census estimate of Painesville's population as 17,503).

conflict of fact is based on expert testimony.'" *Williams v. Ford Motor Co.*, 187 F.3d 533,544 (6th Cir. 1999) (quoting *Hayes v. Douglas Dynamics, Inc.*, 8 F.3d 88, 92 (1st Cir. 1993)). Therefore, because Dr. Kornberg's testimony is a legal conclusion, it does not create a genuine issue of material fact.

Thus, Plaintiffs have not presented a genuine issue of material fact that would warrant a reasonable physician to order medical monitoring. Medical monitoring is a purely equitable form of relief which should only be granted with prudence. "There is no power the exercise of which is more delicate, which requires great caution, deliberation, and sound discretion, or more dangerous in a doubtful case, than the issuing [of] an injunction; it is the strong arm of equity, that never ought to be extended unless to cases of great injury . . . .'" *Detroit Newspaper Publishers Ass'n v. Detroit Typographical Union No. 18*, 471 F.2d 872, 876 (6th Cir. 1972) (citation omitted). Plaintiffs' proposed program would likely be extremely expensive[8] and inconvenience thousands of people for many years in the future. Plaintiffs have not presented enough evidence for a reasonable jury to conclude that such a burdensome program is warranted.

### III. MOTION FOR SANCTIONS BASED ON SPOLIATION OF EVIDENCE

Shortly after Defendant filed its Motion for Summary Judgment, Plaintiffs filed a Motion for Sanctions Based on Defendant's Spoliation of Evidence. (ECF No. 85.) Plaintiffs essentially allege four instances of spoliation: (1) Defendant failed to conduct an exposure/risk assessment at the fire site; (2) Defendant did not complete an air dispersion model and did not

---

[8] In an expert report, which Defendant has moved to strike (ECF No. 93), *see infra*, Plaintiffs' expert Harvey Rosen estimates that a medical monitoring program would cost between $277 million and $488 million. (*Id*. at 1.)

properly collect and analyze the smoke plume; (3) Defendant burned the contents of two rail cars involved in the fire and did not monitor the smoke for dangerous particulate matter; and (4) Defendant conducted meaningless testing of smoke samples it did collect before destroying the samples. Plaintiffs ask the Court to grant judgment in their favor, or in the alternative to provide a special jury instruction or some other lesser sanction, due to these instances of spoliation.

Because "the authority to impose sanctions for spoliated evidence arises ... from a court's inherent power to control the judicial process" and because "a spoliation ruling is evidentiary in nature," federal law governs spoliation sanctions. *Adkins v. Wolever*, 554 F.3d 650, 652 (6th Cir. 2009) (citation omitted). "[A] proper spoliation sanction should serve both fairness and punitive functions" and is left to the broad discretion of the district court. *Id*.

Though the Sixth Circuit has not articulated a test for determining when spoliation sanctions are appropriate, a review of both other circuits and courts within this circuit establish a few guiding principles. First, the party having control over the evidence must have had a duty to preserve the evidence at the time it was destroyed. *See Residential Funding Corp. v. Degeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002). Second, the destruction of evidence must have caused prejudice to the party alleging spoliation. *See Schmid v. Milwaukee Elec. Tool Corp.*, 13 F.3d 76 (3d Cir. 1994); *Barton Brands Ltd. v. O'Brien & Gere, Inc.*, No. 3:07-CV-78-H, 2009 WL 1767386, at *2 (W.D. Ky June 22, 2009). Prejudice occurs where the defendant's actions impair the plaintiff's ability to go to trial or threaten to interfere with the rightful decision of the case. *See Adriana Int'l Corp. v. Thoeren*, 913 F.2d 1406, 1412 (9th Cir. 1990). Finally, the severity of the sanctions should correspond with the degree of fault. *Adkins*, 554 F.3d at 652-53.

Plaintiffs have not demonstrated that Defendant had a duty to preserve the evidence they allegedly destroyed or to gather the evidence they allegedly ignored. Plaintiffs make reference to Defendant's awareness of their obligations, but never define from where these obligations arise. Plaintiffs cite no authority recognizing Defendant's obligation to conduct an exposure/risk assessment, to complete an air dispersion model and collect and analyze smoke plumes in a certain way, to monitor the smoke plumes from the rail cars being burned, or to preserve the smoke samples they tested then destroyed.

Moreover, Plaintiffs have not demonstrated prejudice from Defendant's alleged spoliation. First, the evidence in dispute was potentially available to Plaintiffs. While Painesville police and regulatory authorities may have closed the area surrounding the fire, Plaintiffs filed their suit only one day after the incident, while the fire was still burning. Plaintiffs could have moved for judicial intervention to permit counsel and retained experts to observe cleanup efforts. They did not. Thus, any prejudice they suffered once the evidence they desired no longer existed was as much their own doing as it was Defendant's doing.

Equally importantly, Plaintiffs have made no showing of how the allegedly spoliated evidence allegedly would have advanced their case. The crux of Plaintiffs' case is that Defendant's negligence caused its train to derail, thus releasing toxic chemicals into the air, damaging Plaintiffs who were exposed to these chemicals by increasing their risk for disease. Any exposure to these chemicals by Plaintiffs would not have occurred at the site of the derailment and fire, but rather, at locations such as Plaintiffs' respective homes or places of work. Even with the evacuation that took place, Plaintiffs' counsel and experts would have had significant access to the sites of exposure during and after the fire to collect the evidence

-13-

necessary to show damages.  Plaintiffs could have conducted extensive sampling and analysis of the air or soil content of their respective homes or workplaces.  Thus, Plaintiffs were not prejudiced by Defendant's actions.  Accordingly, Plaintiffs Motion for Spoliation of Evidence is **DENIED**.

### IV.  MOTIONS TO STRIKE

Defendant has moved to strike the expert report and exclude testimony of Plaintiffs' expert Dr. Harvey Rosen (ECF No. 93) and have moved to strike the expert affidavit and to limit the testimony of Plaintiffs' expert Dr. Timothy Buckley (ECF No. 103).  Defendant argues that Dr. Rosen's expert report was produced on August 28, 2009, nearly five months after the April 3, 2009 deadline to disclose and produce expert reports.  (*See* ECF No. 78.)  Similarly, Defendant argues that an October 16, 2009 affidavit from Dr. Buckley, for whom Plaintiffs previously produced a timely expert report, should be stricken because it was filed nearly six months after the expert disclosure and report deadline and contains opinions on topics beyond those found in Dr. Buckley's initial report.  (*Id.*)

Defendant's Motions to Strike are **DENIED AS MOOT**.  As they have not been submitted as part of this briefing, the Court has not reviewed Dr. Rosen's expert report or Dr. Buckley's affidavit.  However, Defendant's characterizations of Dr. Rosen's report and Dr. Buckley's affidavit, which have not been challenged by Plaintiffs, suggest that neither are relevant to the pending Motion for Summary Judgment or Motion for Sanctions Based on Spoliation of Evidence.  Dr. Rosen's expert report apparently estimates the cost of a medical monitoring program.  (ECF No. 93 at 1.)  Dr. Buckley's affidavit addresses a theoretical community-wide education plan.  (ECF No. 103 at 1-2.)  As neither would cure Plaintiffs'

deficiencies in demonstrating a genuine issue of material fact as to its negligence claim, the Court's granting of summary judgment in favor of Defendants renders adjudication of these motions unnecessary.[9]

### IV. CONCLUSION

For the reasons stated *supra*, Defendant CSX Transportation, Inc.'s Motion for Summary Judgment (**ECF No. 83**) is **GRANTED**, Plaintiffs' Motion for Spoliation of Evidence (**ECF No. 85**) is **DENIED**, Defendant's Motion to Strike Defendant's Motion to Strike Expert Report and Exclude Expert Testimony of Harvey Rosen (**ECF No. 93**) is **DENIED AS MOOT** and Defendant's Motion to Strike Expert Affidavit and Limit Expert Testimony of Timothy Buckley (**ECF No. 103**) is **DENIED AS MOOT**.

**IT IS SO ORDERED.**

                                           */s/Dan Aaron Polster     11/10/09*
                                           **Dan Aaron Polster**
                                           **United States District Judge**

---

[9] Even if Defendant did not prevail on its summary judgment claim, the Court would grant its motions to strike.  Under Federal Rules of Civil Procedure 26(a)(2)(C) and 37(c)(1), a party who does not comply with a court's order regarding expert disclosures cannot use that expert to supply evidence without a showing that the failure to comply was substantially justified or is harmless. *See also Dickenson v. Cardiac & Thoracic Surgery of E. Tenn.*, 388 F.3d 976, 983 (6th Cir. 2004). Though the harm caused by Plaintiffs' failure to timely produce Dr. Rosen's expert report or Dr. Buckley's affidavit is unclear, Plaintiffs are not substantially justified in submitting these items nearly one half year after the April 3, 2009 deadline to disclose experts and produce expert reports.